My name is Jim O'Brien. I'm here today on behalf of the defendant appellant, Sandra Bart. May it please the court. This case involves my client, as I mentioned, Sandra Bart, who is a seven-year-old grandmother without prior history of any trouble of any kind of the hiring with a Minnesota farmer who she never met, concerning operations at a farm she's never been to, related to his submitting false declarations to the government on visa paperwork that she did not see or participate in preparing prior to its being filed. The entire, it's a conspiracy case, of course, and the entire conspiracy claim against Sandra Bart, my client, is based on an alleged agreement, conspiratorial agreement, between Sandra Bart and an alleged co-conspirator of Willian Cabrera, a Dominican Republic native, who was a worker for her at the time and her operations in Cleveland, Ohio. It's a lawn service. They put together allegedly a plan dated 10-13-08, the so-called project, Labor Listo, in which Dominican Republic workers were recruited to come to American work. Now, the conspiracy involved in the false declarations were made by Mr. Spiegel, the Minnesota farmer, St. Foley, Minnesota. Visa fraud in violation of 18 U.S.C. Section 371, fraud in foreign labor contracting, Section 1349 of Title 18, and then mail and wire fraud connected to the submission of these applications. He had his own immigration agent, a woman named Leslie Downs of Southern Impact, who did not work for Sandra Bart, who was not affiliated in any way with Sandra Bart. Mr. Spiegel was an experienced importer of labor from abroad. He had used Mexican labor prior to his involvement with the Dominicans, and he admitted that his Mexicans were probably illegal. He also had women from Moldavia and the Ukraine selling fruit at fruit stands in Foley, Minnesota, prior to his involvement in the affairs of this case. In any case, the government knows it can't make a conspiracy without a conspiratorial plan. The U.S. Supreme Court in U.S. v. Brose, 1989, has told us that the precise nature and extent of a conspiracy must be determined by reference to the agreement which embraces and defines its objects. The labor listo, the plan that was the centerpiece of the government's conspiracy case, was Exhibit 43 in this proceeding. It was discussed in opening, centerpiece of the opening statement, page 29 of the transcript. Counsel for the government said that Mr. or Ms. Bart, my client, and Mr. Cabrera mapped out a strategy. He actually wrote it on a piece of paper, the labor listo. And under that agreement, they started to engage in their illegal conspiracy. Now, it's important, and I don't want to get too much in the weed on the facts, but Mr. Cabrera... Can you come out when Cabrera started labor listo? Yes, sir. It is October 13th of 08 was when this memo was written. I understand that, I said, but he had, he was using labor listo not only to work, not only with Ms., with the defendant. When did he form the, when did he form that operation? Well, we don't, the record's not clear as to when he himself would have started charging, he was charging a side fee, and the court obviously has reviewed the briefs. Mr. Cabrera was charging his, he and his family in the Dominican Republic were charging these workers, it was unknown to anybody else, a recruiting fee of approximately $1,200 sign-up fee. The record is clear, Sandra Barton never knew about that. I believe counsel for the government has admitted she did, they have no evidence that she knew about that. You are making it sound like this October 08 plan was the formation of labor listo, and I had the impression from the briefs that that was Cabrera's on, existing, ongoing way of recruiting workers in Dominican Republic. Your Honor, that's not my, my understanding. My understanding is that, yes, sir, no, I don't believe it does. Anyway, the items on the labor listo in the 10-1308 document, Exhibit 43, were listed, and they were just testified to you at length by Sandra Barton in her testimony. There were a series of seven items, all of them were discussed, none of them are illegal. In connection with the visa applications here, and by the way, this H-2A visa application is for foreign workers who will be working in an agricultural context. The H-2A workers are, can be required to pay their own expenses. Items on the labor, on the labor listo, Exhibit 43, were for computer charges, email and internet access, completely permissible. Item 3 was for personal expenses, permissible. Number 4 was help with sources in the U.S. not connected to recruitment, permissible. Number 5 was expenses for traveling. I want to ask you about number 3. Yes, sir. In October, 08, I know the law changed, I don't know if the statute changed or just the regs in 09, in October, 08, just going by the plain language of that note, was that legal or not? For H-2A? For H-2A, we believe it was legal because they were personal expenses of the individuals. Travel expenses. The government's brief says travel expenses were, could not be paid by the... Well, in 2008, the government is, if that's the government's contention, is wrong because under the, under the interpretation of those regulations, and Your Honor, we are talking about regs here. There is no, the false declarations of Mistress Fihel were false, not under statutory law, but under regulatory law. So we are talking only about the H-2A regulations found at 21 CFR, I believe it's section 655, 20 CFR section 655.20 for H-2B, 655.122 for H-2A. So the regulate, the regs are the basis of the law in question here, and the fact is that in 2008, the prevailing interpretation from the Department of Labor was that the travel expenses of H-2A workers could be charged back to those workers. And that site, it's in our brief, obviously, but the 73 Federal Reg, Federal Register 78039. So in any case, the, the so-called conspiratorial document did not carry the day for the government. What, what happened in the case was Mistress Fihel evidently was charging the wor, variety of sins, was charging his workers for airfare, was charging them for room and board, was charging them for wage increases that did not occur, did not increase their wages in accordance to the prevailing wage. Again, at his farm operations in Minnesota. But a primary feature of the government's case, of course, was this airfare from the Dominican to Minnesota and back, which was being charged to the workers by Mistress Fihel. Well, the problem with the case was that the conspiracy did not, not only, not only not discuss airfare, this Labor Listo document from 10-1308 did not discuss airfare in any way. Your Honor. Was the, what you call as a new airfare, had that been done clearly in 2009? Your Honor, I don't believe it was, I don't believe it was. And, but the, but the fact of the matter is when the. Judge charged the jury with respect. Well, I understand, I understand he did that, Your Honor. But with regard to airfare. I mean, you assert, you assert at one point in the briefs, I think maybe the reply brief, that the government was required to prove to the jury what the, what the regulations, what the law was as prescribed in the regulations. I was going to ask you, give me a case that says that. Well, Your Honor, I think that the, the case is that in order for Fihel to violate the law in 2000, let's say in 2014, he's got to run afoul of the regulations. There was that testimony. But remember that the case against Sandra Bart was not, did she violate the law? Your reply brief says, according to my notes, that the government was, quote, obligated to prove the H-2A program regulatory requirements. I want to know a case supporting that assertion, which was not, there was no authority cited for that. Well, Your Honor, I think you'd have to prove the elements of the conspiracy. But that's not the point. The court, the court tells the jury what the law is, right? Sure. Okay, so your, your assertion and your reply brief is just wrong. Well, Your Honor. The government didn't have to prove to the jury. Might have, might have had to persuade the court what the law was. Well, I don't think that. But that was done, and I can't tell from your brief whether you're arguing that there was an error of law by the court. Now, obviously, a knowing violation is different than, you know, they've got to prove that. But you're going back and saying, wait a minute, the government didn't put the regs in, and it didn't prove to the jury what the regs meant. And I say, you've got to give me, you've got to give me a citation that says the government had to do that. Well, Your Honor, I think that I don't have a case that I've cited. I think it's, our position is it's axiomatic that the, it's incumbent upon the government to produce an accurate accounting of the law at the time the conspiracy was allegedly formed, which would be 10-1308. Well, the time of formation doesn't matter. Well, it does to us, Your Honor. No, it does. But all of the overt acts that occurred after 2010 are sufficient to prove a conspiracy, aren't they? No, because that's not the conspiracy that's being alleged. The government can't have a floating version of a conspiracy that just, go and argue to the jury one conspiracy, get a conviction, then come here and argue something completely different. The centerpiece in the, this whole case was about the labor list O, the document of 10-1308, which at that time contained items that were not illegal at that time, or in fact, subsequently. If I may switch quickly, we have another issue that I would like to discuss. I have reserved some time in rebuttal, but the second issue we've appealed is the error, we believe, that occurred when the district court abused its discretion denying a motion for new trial for failure to allow the defendant to conduct an evidentiary hearing. After a jury, who later became the foreman of the jury, announced guilty to the other jurors before the case was instructed and submitted. This trial commenced on August 1 of 2016. The government rested on August 4. After the government rested, but before the instructions, and before the case was submitted, a U.S. attorney stepped down an elevator and overheard one of the jurors, who we believe later became the foreman, announce to other jurors that the defendant was guilty. Counsel, to her credit, that assistant U.S. attorney brought the matter to the court's attention. A conference was held on 8-8-16 to address the issue. Counsel, defense counsel, asked the court to question the juries to discover if there's any prejudice. The trial judge in this matter rejected that request and declined to do so. The trial judge indicated that it was unknown what was meant. He questioned whether there had been an obligation to even bring this matter up. The trial court mentioned that he did not know what this juror meant, that it was uncertain. I think the quote was the court said it could have been 100,000 things. The court then proposed a curative instruction. Defense counsel rejected that and the court indicated that it would overrule the defense counsel's request for an opportunity to inquire of the juror and get to the bottom of the bias. The trial judge said he did not want to make a big deal out of it. He did not want to make another trial out of it and rejected her request. The legal argument is as follows. The Constitution secures the right to trial before an impartial jury under the Sixth Amendment, under the Weinbrenner case, an Eighth Circuit case. Is it fair to say your legal argument is Judge Bright's dissent in Giannakos? Yes, but I want to add one more thing to it, Your Honor, and that's this. In Giannakos, it's crucial to understand that the trial counsel in Giannakos did not request an opportunity to question the juror. And here's why that matters. Under the Supreme Court's instructions in Smith v. Phillips, the appropriate remedy, and that's 1982. I agree with that point, but that wasn't the debate in Giannakos. If Judge Bright was correct that premature deliberation is juror taint, then it seems to me you would have a very powerful argument that the district court had to have . . . The majority didn't go there. The majority said it doesn't matter what it was meant. You've got to have prejudice when there's no external influence on the juror, right? Judge, that's true, except the point about bringing up Smith v. Phillips is you have to have the opportunity to show the prejudice by having the opportunity to question the juror in the hearing. I understand that point, but there's a question to follow on because your assertion of prejudice in the reply brief is they hadn't heard the closing arguments and the instruction. Fair point. You had to go there because all the evidence was in. There wasn't evidence they hadn't heard. So how would a hearing and questioning the jurors have contributed to that prejudice argument? Well, that's precisely why Smith v. Phillips says you have to have the opportunity to have the hearing and find out. No, no. You don't get it. It's like a Franks hearing question. If you don't have a substantial showing that a hearing may be useful, it's no abuse of discretion to deny you a hearing. That's not what Smith v. Phillips says, Your Honor, in our reading of it. If you don't have the opportunity to show the . . . But what would you have asked the juror? Would you say that the hearing had to include the jury's hearing, the closing argument, and the instructions they did not yet have, so that you could establish whether that would have influenced . . . assuming the use of the word guilty and factual was a comment on the case. I don't understand how questioning the jurors about what they hadn't heard . . . What answer would have confirmed prejudice? Well, that's why you have to ask the questions, Your Honor. I mean, if you don't . . . you've conceded that there's a taint. You've conceded that this comment was made. His mind was made up. He's communicated to the other jurors, but no one wants to know why. That's not consistent with the Sixth Amendment. That's not consistent with due process, to just close the eyes, cover the ears, and say, we don't want to know. Judge Bright's argument, which I . . . whether or not I agree with it, it's a powerful point of view, but it's not Eighth Circuit law. But the thing that you have to remember about Giannakos is, it was an easy call for the Eighth Circuit because no one objected in the trial court. You can't go around overturning verdicts when the defense counsel doesn't make a point of the issue. Otherwise, every case would be subject to a review. Okay. I'm out of time. I appreciate it. I have reserved some time for rebuttal. Thank you. Very well. We'll hear from the government. Good morning. My name is Manda Sertich. I represent the United States and served as trial counsel for the government in the case of the United States v. Sandra Bart. I'll start with the juror communication issue, since that's where we left off. I wanted to make one point of factual clarification. Both the reply brief and the representation made by defense counsel here today seems to suggest that the government has conceded, or that it's clear that the person who made the comment became the foreperson of the jury. That's actually not supported by the record. There's an equal chance, based on the record, that either the person who said the word guilty became the foreperson of the jury, or an equal chance that that was the- Do you think that matters to this legal issue? I actually don't. If it did, then we'd have an inadequate record. Right. This is an abusive discretion standard, and obviously there was no foreperson of the jury when the trial court made its decision about whether or not to have an evidentiary hearing. So it would have been impossible for the trial court to abuse its discretion based on whether or not this person ultimately became the foreperson. But the other individual who may have possibly said the word guilty was dismissed from the jury for medical reasons before deliberations began. I'd also like to address the point brought up by Your Honor, Judge Loken, regarding the dissent in the Giannikos case. I think there are two distinctions between this case and that case that are important here, and that make it clear that this case is even less serious conduct. There's even less of a chance that an evidentiary hearing was warranted here. The first is that in the Giannikos case, the juror made a comment or mouthed the word guilty, according to the dissent, before hearing all of the evidence. This was four days into a nine-day trial in the middle of the government's presentation of the case before the defense had any chance to prevent any evidence. And the dissenting opinion in Giannikos characterized this as an improper burden shifting to the defendant that prejudiced the defendant. That's not the case here. If the juror who said guilty had made up his mind when he said that word, he did so after both the government and the defense presented their evidence and rested in this case. The jury actually was already aware of the elements of the charged offenses because the district court summarized those elements in preliminary instructions, and therefore it's the government's position that there was no prejudice to Ms. Bart because there was no improper shifting of the burden. The second distinction between the... Is that the only conceivable prejudice? No, Your Honor. I'm just making the distinction between this case and the Giannikos case. I don't understand. I understand the evidence wasn't all in point. I don't understand this burden shifting point. The point is that all of the evidence in this case was already in, in Sandra Bart's case. They'd heard all of the government's case. They'd heard witnesses for the defense, and the defense rested. And so there wasn't an improper burden shift to the defense. They'd already presented all of their evidence. The second distinction between this case and the Giannikos case is that the curative instruction that was given in that case was actually an erroneous instruction. The curative instruction implied to the jurors that it was okay if they came to their own personal decision before hearing all of the evidence in the case, so long as they didn't share that belief with any of their other jurors on the jury with them. That did not happen here. The instruction here given by the trial court was proper. He indicated that he understood there may have been some discussion outside of the courtroom in advance of the appropriate time for deliberations, and instructed them that they were not supposed to do that. So it's the government's position that the Giannikos case, which still, you know, The defense counsel also noted that in that case there's a difference because the defense lawyer didn't object during trial, and that's true. And so there was a different standard applied by this court in that case. However, in that opinion, the court still says that the judge acted within his broad discretion in giving the curative instruction, which implies that that case would have also satisfied the abuse of discretion standard. In this case, the trial was handled by a very experienced trial court. It's clear from the record of that conference regarding the juror communication that the district court's clerk had reviewed the relevant case law. There was some exchange between the judge and the clerk about the relevant case law. It's clear that the judge considered the facts. Yes, Your Honor. There's a point at which he asks his clerk, you know, you've reviewed the case law. Do we have any potential language for a curative instruction in those cases? And both myself and the clerk say, well, we there's discussion of the curative instructions, but we don't think there's one on point that should be. I must say, Mr. Chich, your lengthy discussion of this case lends more credence to the claim than I thought it had. I guess you can argue your case any way you want. Are you ever going to get to the merits? I can move on to. How many people were involved in this conspiracy? Sorry, Your Honor. How many people were involved in this conspiracy? There were three conspirators charged. One of them was named. Let's see. What are their names? I keep forgetting them from the brief. This defendant is Sandra Bart, and then there's John Spiegel, the farmer. Right. And? William Cabrera from the Dominican Republic. I forgot what happened to those two people. They both cooperated with the government and testified at trial, and they were both convicted and sentenced for their crime. They pled and testified to cooperate. Yes, Your Honor. What I would say about. . . What about the floating conspiracy? That sort of found out an intriguing, perhaps an accurate description of what the government did here. Yes. The government disagrees that the entire conspiracy is wrapped up in this October 2008 business plan. We view the business plan as just one document amongst many that corroborate Ms. Bart's co-conspirator's testimony about how this all. . . Well, the government's argument is that this case does not relate to the violation of regulations. This is a case about a conspiracy to commit fraud. And in the government's view, it doesn't matter even if they technically violated the regulations, although both Mr. Spiegel and Mr. Cabrera say that they did. It would not matter if the law didn't require the employer to pay travel expenses and these other issues? Well, the only reason it matters in the government's view is because the conspiracy is to commit fraud on these forms that were submitted to the government, the ETA-9142 and the I-129. All three of the counts relate to the fraudulent statements made in those documents to the government. And so the fact that. . . You're teaching me a new case. I thought there was. . . I mean, the visa. . . That's not all the statutes. What's the visa fraud statute? So the. . . I don't know. So it's irrelevant, despite your lengthy brief, that there was pocketing of money from the workers that was the employer's obligation by law to incur? No, those facts are. . . That was the visa fraud. It's relevant to the visa fraud, but whether. . . It is the visa fraud. Right. But it's. . . The violation of the regulations themselves is not what the case is about. The case is about those fraudulent statements that were made on those forms saying, I'm going to pay the adverse wage, and I sign my name under penalty of perjury saying that that's what I'm going to do. And then. . . This wouldn't affect this case? I think that that would have been a problem for us to handle at trial, but that's. . . It would have been a problem for you to handle with the district court, first of all. Right, but that wasn't the case here. No, it is. I mean, you said forget whether we violated the regs. That wasn't our case. The forms are consistent with the regulations. Yeah, but did we have a. . . Do we have a ruling from the district court to that effect? Or were instructions regarding the regs and the forms consistent with them? The testimony from the government employees about what the regulations were was consistent with what the forms said. In terms of actually admitting the forms, the government did that. They were summarized on Government Exhibit 81, and they were all of the forms admitted at trial. They set forth the attestations made by Defendant Spiegel. A witness from the Department of Labor, Ms. Tout, summarized that exhibit for the jury. And as the DOL witness, she also showed the jury exactly where on those forms those attestations appeared. A witness from USCIS, Eric Potter, showed the jury exactly where the attestations in the form. . . I'm going to have to study the instructions, obviously. Okay. What you just told me is that this wasn't three crimes. This wasn't a conspiracy to commit three different offenses. This was just one big one. So it didn't matter what the regs meant. It didn't matter what the law required them to do if they filled out a bad form. They committed all those crimes that the jury convicted them of. The purpose of each of the conspiracy and the underlying facts was the same for each of those three counts of the indictment. I'm not at all sure that that's an accurate reflection of the elements of those offenses. The elements are slightly different. For example, in visa fraud, you have to prove that some government agency relied on the statements in the forms in making a decision. The agency witnesses testified that if those questions had been answered differently. . . they would have rejected that application. I'm just quickly looking at Ms. Bart's brief again. Let's see. It's zeal to obtain a felony conviction on the one defendant who didn't plead. The government, in its arguments through its witnesses or its presentation of evidence, never mentioned that the U.S. Department of Labor had completely flip-flopped on the legality of the conduct at the heart of its conspiracy claim. Sort of an intriguing argument. What is your position? Did your client, the government, take inconsistent positions or have shifting grounds? No, that's completely incorrect, and that was never presented to the jury either. The case cited by the defense, this Castellanos case, and the DOL interpretation that they attached as an addendum to their appeal, this has to do strictly with the Fair Labor Standards Act and the Department of Labor's assessment of whether the Fair Labor Standards Act requires the employer to pay travel expenses. That's an entirely separate law from what the HVISA regulations require. In this case, the defendant violated what? . . The regulations, but the statute. We believe that they also violated the regulations, and it was the HVISA regulations. I read this, I was thinking of, oh, 10, 12 years ago, who was that lawyer from Boston, Harvey Silvergate, who wrote that book entitled A Felony a Day, about all of us probably highly likely that all of us commit crimes that we're unaware of. Well, now, specifically, your brief, as I summarized it, says it's final testifying that Bart told him, probably in 2011, that he need not pay the Department of Labor wage increase. Was that an overt act of the conspiracy or not? Yes, and I believe that that . . . So this notion that forget about the FLSA because we were talking about HVISA fraud is not the way the case was tried. Well . . . If that's an overt act, it's an overt act of conspiring not to obey the way the law sorted out who can pay what of the expenses of an immigration worker. That's one piece of it, but in this case, the form also, John Spiegel signs his name saying, I will pay this worker the adverse wage. And so when he agrees with Sandra Bart that he's not going to do that, he's committing fraud on those forms. The forms themselves . . . I don't see why . . . I don't see how Ms. Bart is implicated in the way he and Downs filled out the forms, based on the way you're arguing the case. The reason is because Ms. Bart understood the regulation. She testified she understood all of the regulations. Everyone who worked with her said she did. The only crime was Bart was falsely filling out the forms. That's a much narrower conspiracy than I thought we were dealing with. Well, Ms. Downs testified that Sandra Bart spoke with her regularly about filling out the forms for Mr. Spiegel. She was involved with the document preparer for Mr. Spiegel. And they agreed to commit this fraud upon the government by saying, yes, we're going to attest that we're going to pay the adverse wage. We attest that we're going to forbid any foreign labor recruiter from seeking or receiving payments from workers, that we're going to provide transportation for the workers, that we've not sought or received any kinds of payments, including kickbacks or concessions. We're going to swear to the government that we're doing all of those things so that we can get permission to bring in these workers, when the plan was to not do those things. That is the basis of the conspiracy of the fraud on the government. Mr. Spiegel and Mr. Cabrera both admitted that they committed that fraud on the government, and they specifically testified that they agreed with Ms. Bart to do so. They also, you know, there was an abundance of documentation corroborating their testimony. I know the defense obviously made a point of noting that these are cooperators who are going to get some benefit. Going back to Mr. O'Brien's early argument where, referring to his client, she didn't know anything about the farm. Had she ever met either of these two defendants? Mr. Cabrera was her employee for a number of years. They were very close. How do you pronounce it, Silva or Spiegel? Spiegel. Yeah. No, she recruited Mr. Spiegel via the phone. So his recollection is that she called him, and he testified that they were in very regular contact, and there's e-mail communications regularly between the two of them, as well as between Ms. Bart and his document preparer. And so I guess your response is, well, it's a nice argument, but it's irrelevant, the fact that they had never met face-to-face or anything like that, right? That's right. I mean, you can conspire with a lot of people that, well, I guess you can conspire with somebody you've never seen face-to-face. True. But it is a certain opening of emotional appeal, but I guess you've tried to dissipate that. Yeah. I don't believe it's relevant. They testified about being in very close contact. Certainly when they decided to retaliate against the employees, they were sending those documents back and forth to each other and making notes on them. They were in close contact. Well, we thank you for your argument. Thank you very much. Does Mr. O'Brien have any time? No, he doesn't. Oh, I was here for a moment. You should have walked. Well, put it this way, we'll give you two minutes, and I'll have to put up with my colleague's ire, perhaps. No, no, it's no. I appreciate it. But you should learn to watch that clock. I greatly appreciate it. Let me make two very quick points. On the jury trial issue, I just want to read from Giannakos. I can't do that. Okay. We've read it, or we will read it. Right. That's fine. Then I want to, Giannakos called for a matter which comes to the attention of the trial judge, which may affect impartiality on the part of jurors to command careful attention. And in that case, since the defense counsel had not raised an issue at all, careful consideration was given. There was no discussion, no request to talk to a juror,  The court had to, in order to follow Supreme Court's guidance, conduct a hearing to determine whether there was a possibility of bias. On the issue of the conspiracy, I would just like to make a clarifying point, hopefully. The count in the instruction that was submitted to the jury for both visa fraud and fraud in labor contract required a false statement under penalty of perjury, with knowledge that the statement was untrue, on an application required by the laws or immigration regulations. And the statement was immaterial. Of course, those applications were filled out by Mr. Spiegel only. Now, the reason, if the court was somewhat confused about exactly what the government was calling a conspiracy, the reason is, had the government taken the position that Sander Bart, living in Cleveland, Ohio, with no involvement in the Minnesota operation, was somehow for no reason directing his operations in Minnesota, telling him what to do, that case would have gone nowhere. The government had had to create a fiction of this agreement between William Cabrera and Sander Bart back in 08, which they later on drew Mr. Spiegel into. That was the only way they could get a conspiracy conviction. Of course, the conspiracy that was allegedly formed in 08 did not have an illegal purpose. I just would also like to finally point out that Kristen Trout, the government witness, put on the primary witness for the guard of what these requirements were, testified that the H-2A requirements have remained the same for decades. Quote, unquote. That was a patently false statement. It misled the jury. Judge Loken asked if we were contending if that was instructional error or legal error. We believe it's a sufficiency of evidence error that the government simply did not make its case approving. Not on this particular point of the law remaining the same for decades, Your Honor, there was not. I did not try the case. Defense counsel did not ask if that were true or not. That's not only limited to plain error review. That's no review at all. There's no objection to that testimony. Well, it is. If there's no objection and or cross-examination. It taints the government's case, Your Honor. Was there an objection or cross-examination? Well, there certainly was a motion for it. At the time, when the witness was on the stand, what did the defense counsel do? There was no objection to that particular question, Your Honor. And there was no cross-examination on the point? Not on that particular issue, no. Thank you, Your Honor. Appreciate it. Thank you, Judge. The case is submitted, and we will take it under consideration.